☑ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

11:15 am, Jan 04 2022

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE SEARCH OF
AN ELECTRONIC DEVICE
CURRENTLY IN THE CUSTODY OF
THE FEDERAL BUREAU OF
INVESTIGATION

Case No. __1:21-mj-3400 TMD__

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Shane Lettau, a Task Force Officer with the Federal Bureau of Investigation, being first duly sworn, hereby depose and state as follows:

### PURPOSE OF THIS AFFIDAVIT

1. I submit this affidavit in support of applications for a search warrant seeking authorization to search:

   a. A Silver & Black, Apple, iPhone SE, Model A1662A, bearing IMEI: 356596081707942 (hereinafter, the **Subject Electronic Device or SED**.) The device was recovered from **Ronald JONES** inside of the Maryland Department of Correction's Metropolitan Transition Center (MTC) located at 954 Forrest Street, Baltimore, Maryland 21202.

2. The **Subject Electronic Device**, further described in Attachment A-1, is presently in the custody of the Federal Bureau of Investigation's Evidence Unit located at 2600 Lord Baltimore Drive, Windsor Mill, Maryland 21244 in the District of Maryland.

3. I submit that there is probable cause to believe that the **Subject Electronic Device** contain evidence of Possession with the Intent to Distribute a Controlled Dangerous Substance in violation of 21 U.S.C. § 841(a)(1) (the **Subject Offense**). There is also probable cause to search the **Subject Electronic Device** as described Attachments A-1 for evidence, instrumentalities, contraband, or fruits of this crime as described in Attachments B-1.

## JURISDICTION

4. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. See 18 U.S.C. § 2711(3)(A)(i).

## AFFIANT BACKGROUND AND EXPERTISE

5. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

6. I have been a duly sworn member of the BPD since January 29, 2002. I am currently assigned to the BPD's Criminal Investigation Division, working as a Task Force Officer for the FBI since May 2018. Since I began my career as a Baltimore Police Officer in January 2002, I have been assigned to the following units: Patrol Division, Mobile/Special Enforcement Teams, Organized Crime Division Narcotics Investigation, Violent Crime Impact Section Violent Repeat Offender Squad, Central Intelligence Division – HIDTA/ DEA and the Homicide Unit.

7. I successfully attended the Baltimore Police Academy, completing twenty-six weeks of training, including a forty-hour block of specialized training within the areas of identification, packaging and distribution of Controlled Dangerous Substances (hereinafter referred to as "CDS"). I have taken a sixteen-hour enhanced training course entitled "Drug Identification," focusing on the distribution, packaging, identification, and case law of CDS. I have also successfully completed a sixteen-hour course entitled "Criminal Street Gangs – Overview," which explained how criminal gangs utilize narcotics sales to finance criminal

enterprises. I have successfully completed a sixteen-hour course entitled "Introduction to Money Laundering" and an additional 24-hour course entitled "Money Laundering Techniques," which focused on recognizing potential money laundering violations, both international and domestic, while investigating narcotics-related violations. I have attended a 32 hour training course entitled "Digital Data Exploitation in Criminal Investigations." I have completed a one hour training entitled "Cell Site and Mobile RF Analysis. How to Extract Meaningful and Actionable Information for Criminal Investigations," a one hour course entitled "Cyber Intelligence Operations – Collecting Evidence in an Encrypted World," a one hour course entitled "Transitioning Lawful Interception from 4G to 5G: What it's looking like and Challenges Ahead," a one hour course entitled "Social Media Intelligence Gathering for Analysts and Investigators, a one hour course entitled "Locating and tracking Devices by MAC addresses and app-based SDK's: limitations and emerging OS-based privacy measures," a one hour course entitled "Effective, Covert and Dynamic Investigative Tools and Techniques for the Modern Cyber Investigator," and a one hour course entitled "Innovative methods on How to Defeat (or Work Around) Encryption before Seizing the Targets Smartphone." I participated in a one hour webinar entitled "DEA Narcos – How We Took Down Pablo Escobar" presented by former DEA Agents Javier Pena and Steve Murphy. I also attend annual in-service trainings and complete courses and tests hosted by the BPD, which review and update investigators in the areas of CDS recognition, recent case law, and current trends. I have directly and/or indirectly participated in the arrest of well over 500 persons for violations of CDS laws, which has resulted in the seizure of various amounts of heroin, cocaine, marijuana and other illegal substances. I have been involved in the preparation and/or execution of well over 100 search and seizure warrants, during which time CDS, firearms, and United States currency have been recovered.

8. I am familiar with the language, terminology, and street slang used by persons who purchase and distribute CDS. I am also familiar with the prices and packaging and paraphernalia used to distribute and manufacture CDS. I have surveilled numerous narcotic transactions on the streets of Baltimore City and within the Baltimore Metropolitan Area. As a result of these observations, thousands of arrests have been made for CDS violations and narcotics transactions. Furthermore, I have conducted surveillance and enforcement activities in other states and in Africa as part of investigations of narcotics-related activity.

9. I have interviewed numerous confidential informants, cooperating witnesses, street level, mid-level, narcotics distributors/traffickers, and narcotics importers along with common narcotics users. This has provided me with an intimate insight into drug trafficking patterns. I am also familiar with the counter-surveillance techniques utilized against law enforcement by drug traffickers.

10. I have testified over 20 times as an expert regarding the identification, packaging, and sale of CDS in the district, circuit, and federal courts of Baltimore, Maryland. I have also testified in state and federal grand juries on a number of occasions and as a result, the grand juries returned indictments against defendants.

11. As a result of these experiences and others, I am familiar with matters including, but not limited to, the means and methods used by drug-trafficking organizations to conceal, purchase, transport, store and distribute drugs, and to conceal profits or fruits generated from those transactions. Based on my knowledge, training and experience, I have become familiar with the methods of operations commonly used by individual drug-traffickers, including, but not limited to, the importation, manufacture, concealment and distribution of controlled substances. As a result of these experiences and others, I have become familiar with the techniques

commonly used by drug-traffickers to facilitate and obfuscate illegal activity, including use of: telephones, mobile phones, prepaid phones, calling cards, public telephones, text-messaging, encrypted-messaging, counter-surveillance, false or fictitious identities and businesses, and coded communications to communicate with customers, suppliers, couriers, and other conspirators for the purpose of insulating themselves from the detection of law enforcement and rival drug-traffickers; that it is not unusual for drug-traffickers to establish such mobile / prepaid phones, vehicle registration and titling, applications for and payments of rental properties, including places of residence and storage facilities and utility services for these properties and the like, in the name of an associate, family member, fictitious or deceased person or business, wittingly or unwittingly; that drug-traffickers require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing controlled substances, and for arranging the concealment of proceeds derived from the sale of controlled substances; that drug-trafficking is an ongoing and evolving process that requires the development, use, and protection of a communication networks enabled by a market of publicly available and advertised encrypted messaging and calling services; that drug-traffickers regularly use coded language when speaking or writing to other drug-traffickers to confuse, disguise or otherwise thwart law enforcement's efforts to penetrate communication networks and telephone facilities engaged in drug-trafficking.

12. Through my training and prior experience, I know the following:

    a. Drug trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, drug trafficking is an illegal commercial activity that is characterized by regular, repeated criminal activity.

    b. Cellular telephones are an indispensable tool of the narcotics trafficking trade. Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service (SMS), electronic-mail, and similar electronic

  means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers. In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their Drug Trafficking Organization (DTO), or at random in order to frustrate law enforcement efforts.

 c. Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. Drug traffickers often have several residences decreasing the likelihood of detection by law enforcement;

 d. Drug traffickers use cellular telephones and other electronic communications devices to facilitate illegal transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the firearms and drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices; they also use their cellphones to communicate on various social media platforms such as Facebook and Instagram; and,

 e. Drug traffickers use computers or other electronic storage media, including smart phones, to store the records documents, take and store photographs and videos of co-conspirators, and contraband or items listed in paragraphs (c) and (d).

13. I also know, based on my training and experience, that individuals involved with drug trafficking and illegal firearm possession frequently use cellular telephones, communication devices, and other electronic media storage to further their illegal activities. Persons who have firearms tend to take photographs of the firearm and ammunition, which is stored on their

electronic device. An individual may communicate with others in reference to the purchase of or the selling of firearms and CDS through their electronic devices. Individuals found with firearms and CDS often post pictures of evidence, fruits of the crime, and instrumentalities, on social media pages to show others with whom they are connected, and use cellular telephones to take these pictures.

14. Because this affidavit is being submitted for the limited purpose of establishing probable cause to search the **Subject Electronic Device,** I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and intercepted conversations, as well as conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

## PROBABLE CAUSE

15. On May 28, 2021, at approximately 6:00 P.M., detectives with the Baltimore Police Department's (BPD) Southwest District Action Team (DAT) conducted an investigation into drug trafficking activities in the vicinity of a Crown Gas Station in the 1800 block of Bloomingdale Road, Baltimore, Maryland. During the course of their investigation, a detective conducting covert surveillance recognized an individual known to the detectives based on prior encounters as Ronald JONES (Maryland State Identification Number 3692735.) JONES was wearing a grey hooded sweatshirt, and a black hat, and carrying a grey Under Armour backpack. The detective observed JONES holding clear bottles that appeared to contain marijuana, and then

showing the bottles to people as the approached the Crown to pump gas. JONES also readjusted an object in his front sweatshirt pocket on several occasions, and the detective was able to see what appeared to be the imprint of a firearm in his sweatshirt. Based on these observations, the detective believed that JONES was attempting to sell marijuana and was armed, and he alerted the arrest team.

16. Prior to the arrest team responding to the Crown, the detective conducting covert surveillance watched JONES walk away and enter the driver's seat of a burgundy 2013 Nissan Altima bearing West Virginia Temporary Tag 412598 that was parked nearby. A second individual entered the passenger side of the vehicle, and then JONES drove back to the Crown and parked at a pump. Both individuals remained in the vehicle with the doors open while conversing with others in the area.

17. The arrest team arrived at the Crown in a fully marked BPD patrol vehicle with departmentally issued tactical vests conspicuously marked "Police" on the front and rear. When detectives approached the Altima and exited the patrol vehicle, JONES and the other occupant fled the scene in the vehicle. Detectives followed the vehicle into the rear alley of the 3000 block of West North Avenue where the vehicle was abandoned, first by the unknown passenger and then, a short time later, by JONES on foot. Detectives pursued JONES on foot and apprehended him in the 2900 block of Westwood Street. As detectives pursued JONES, other law enforcement officers maintained surveillance of the abandoned Nissan Altima.

18. JONES was searched, at which time investigators recovered a clear bottle containing suspected marijuana, four Subxone strips, and two Cellular Phones.

19. Detectives then searched the Nissan Altima and recovered the grey Under Armour backpack similar to that which was previously seen in the possession of JONES. Inside the

backpack, the detectives found numerous bags and jars of marijuana, along with a digital scale.

20. Also inside the vehicle, they found an Amadeo Rossi, .44 caliber revolver handgun, Serial Number AB065394 loaded with one spent shell casing and four live .44 caliber rounds, along with additional marijuana.

21. The firearm was located beneath the driver's seat, towards the rear. The total amount of suspected marijuana was approximately 322 grams.

22. JONES is prohibited from possessing a firearm based on his prior criminal history, including a 2016 federal conviction for Possession of a Firearm and Ammunition by a Prohibited Person (JKB-16-0341) for which he received a sentence of 30 months' incarceration. As a result, he knew or should have known he was sentenced to more than one year of incarceration and therefore prohibited from possessing a firearm.

23. As a result of the aforementioned investigation, on October 5, 2021, the Honorable Thomas M. DiGirolamo, Magistrate Judge of the United States District Court for the District of Maryland authorized search warrants for the cellular phones recovered from JONES pursuant to his arrest and his Instagram account identified as "bstreet_bo" (1:21-MJ-2745 TMD and 1:21-MJ-2746 TMD.) The warrants were served on or about October 6, 2021. The cellular devices were locked and the codes could not be bypassed at this time. Your affiant served Instagram with the search warrant and received the return on November 4, 2021. In summary, evidence related to drug trafficking and several other crimes was discovered within the account.

24. Based on further investigation, investigators learned that JONES continued to utilize his Instagram account while incarcerated and posted several publicly-available photographs online. The images depicted him in a jumpsuit in what appeared to be a prison facility. The following examples are examples of "stories" posted by JONES from inside of the

facility:





25. Investigators also identified consensually-monitored prison communications in which JONES discussed smuggling Suboxone and a cellphone into prison.

26. Given these communications and JONES' Instagram posts, investigators contacted members of the Maryland Department of Public Safety and Corrections (DPSCS). On October 28, 2021 at approximately 2:12 A.M., DPSCS personnel searched MTC's G-Dorm where Ronald JONES was being held. JONES was located sleeping in a bunk with a white iPhone charger plugged into the wall next to him. When JONES stood up to be handcuffed, several items believed to be contraband cigarettes were found in his hand. Investigators then found the **Subject Electronic Device** inside of JONES' shoes that were located in his bunk.

27. JONES was later searched in accordance with DPSCS policy, and 130 orange

11

strips of suspected Suboxone were recovered from his anal area. Corporal S. Clifton, a Certified M.M.C. Drug Tester, determined that the orange strips field tested positive for Buprenorphine, an opioid that is similar to Suboxone and also a controlled dangerous substance.

28. Your affiant is aware, based on training, knowledge and experience, that items including, but not limited to cellphones, tobacco and Buprenorphine are illegal in the prison system but are often smuggled in through visitors and Correctional Officers. Within the prison system, items such as cellphones and Buprenorphine are readily traded, sold or provide for money that is digitally transferred or other types of consideration. Inmates often sell Buprenorphine strips for $100-$200 each, which is an extremely lucrative business while incarcerated. The amount that JONES possessed could yield anywhere between $13,000 - $26,000.

29. Therefore, based on this seizure and investigation, it is foreseeable that the **Subject Electronic Device** contains evidence of violations of the **Subject Offense**.

## BACKGROUND CONCERNING ELECTRONIC COMMUNICATIONS DEVICES

30. The fruits and instrumentalities of criminal activity are often concealed in digital form. Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity. The **Subject Electronic Device** has both digital storage capacity and digital camera capabilities.

31. Individuals engaged in drug trafficking offenses often use cell phones to communicate with suppliers, to place orders with suppliers, to communicate with customers, to receive orders from customers, and to arrange meeting times and locations for the distribution of controlled substances. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug

trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

32. Narcotic traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

33. Cellular phones associated with drug and firearms traffickers include various types of evidence. Phones may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information.

34. Criminals often take photos of themselves with firearms, large quantities of controlled substances, money, or high-end consumer items, like cars or watches. These "trophy" photos are often maintained on cellular telephones to be shared on social media, or as symbols of their success.

35. Finally, the mere fact of a cellular phone's call number, electronic serial number or other identifying information may be of evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

## FORENSIC ANALYSIS OF ELECTRONIC COMMUNICATIONS DEVICES

36. Based on my training and experience, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. There is probable cause to

13

believe that things that were once stored on the **Subject Electronic Device** may still be stored on the device, for various reasons, as discussed in the following paragraphs.

37. As further described in Attachment B-1, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Electronic Device** was used, the purpose of its use, who used it, and when.

38. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Electronic Device** because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

39. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

40. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

14

41. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

42. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

43. During this case and in numerous others involving complex DTOs, investigators have learned that the drug-trafficking organization relies heavily on electronic devices to facilitate drug trafficking both in and outside of the prison system. In the modern digital age, a wall and rules do not deter participants from continuing their participation in the illegal activities. It is necessary to conduct a physical inspection of the electronic devices in order to obtain electronic communications and other information that might be stored on the seized phone and to determine whether any of the seized phone were the subject of wiretap, pen register or other investigation detailed herein. The phone may also contain data and communications that were not electronically intercepted due to encryption or for other reasons.

44. The device will be examined by persons qualified to perform the search / examination, with any and all necessary and proper assistance, any and all electronic computing or data processing devices and associated peripheral equipment such as computer units, keyboards, central processing units, external or internal drives and/or other receiving devices and

...
...

peripheral equipment such as printers, modems, associated telephone sets, and any other controlling devices and generate copies and photograph any evidence seized and any evidence therein. If needed, the processing may be conducted by a law enforcement entity or facility outside the state of Maryland.

45. Again, the **Subject Electronic Device** remains in the custody of law enforcement. The specific identifiers of the **Subject Electronic Device** are detailed in Attachment A-1 and the types of information expected to be recovered from the device is listed in Attachment B-1.

## CONCLUSION

46. Accordingly, your affiant believes there is probable cause that evidence of the **Subject Offense** will be found from an analysis of the recovered **Subject Electronic Device** described in Attachment A-1 and the information to be located and seized is identified in Attachment B-1.

47. THEREFORE, in consideration of the facts presented, I respectfully request that the Court issue the proposed search warrant for the **Subject Electronic Device** and authorize the search and seizure of the items described in Attachment A-1 for the purposes of identifying the electronically stored data particularly described in Attachments B-1.

## REQUEST FOR NIGHT-TIME AUTHORIZATION

48. There is good cause for the Court to authorize the requested searches at any time of the day or night. The **Subject Electronic Device** is already in law enforcement custody, and it is reasonable to allow law enforcement to execute the requested searches at any hour of the day, even during the evening or night, if doing so is convenient for the investigators or examiners. Because the device is already in law enforcement custody, there will be no prejudice to any other person from this request.

49. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully submitted,

*[signature]*

Shane Lettau
Task Force Officer
Federal Bureau of Investigation

Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) this __8__ day of December, 2021

*[signature]*

The Honorable Thomas M. DiGirolamo
United States Magistrate Judge